IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

BUTTE DIVISION

_____

| | |
|---|---|
| DANNY SARTAIN, | Cause No. CV 12-80-BLG-DLC-CSO |
| Petitioner, | |
| vs. | FINDINGS AND RECOMMENDATION OF U.S. MAGISTRATE JUDGE |
| LEROY KIRKEGARD, Warden, Montana State Prison; ATTORNEY GENERAL OF THE STATE OF MONTANA, | |
| Respondent. | |

_____

On November 8, 2012, Petitioner Danny Sartain filed this action seeking a writ of habeas corpus under 28 U.S.C. § 2254.  Sartain is a state prisoner proceeding pro se.

## I. Preliminary Screening

Rule 4 of the Rules Governing Section 2254 Cases in the United States District Courts requires courts to examine the petition before ordering the respondent to file an answer or any other pleading.  The petition must be summarily dismissed "[i]f it plainly appears from the face of the petition and any attached exhibits that the

petitioner is not entitled to relief in the district court." *Id.*

A petitioner "who is able to state facts showing a real possibility of constitutional error should survive Rule 4 review." *Calderon v. United States Dist. Court,* 98 F.3d 1102, 1109 (9th Cir. 1996) ("*Nicolaus*") (Schroeder, C.J., concurring) (referring to Rules Governing § 2254 Cases). Consideration under Rule 4 "may properly encompass any exhibits attached to the petition, including, but not limited to, transcripts, sentencing records, and copies of state court opinions. The judge may order any of these items for his consideration if they are not yet included with the petition." Advisory Committee Note (1976), Rule 4, Rules Governing § 2254 Cases. "[I]t is the duty of the court to screen out frivolous applications and eliminate the burden that would be placed on the respondent by ordering an unnecessary answer." *Id.*; *see also* 28 U.S.C. § 2243.

## II. Background[1]

Testimony at trial showed the following. On March 25, 2008, after a morning of skiing, Timothy Hop returned to his home on East Aspen Street in Bozeman, Montana. Witnesses testified that the neighborhood was a quiet one, sparsely occupied during the day, though there was a construction project ongoing about half

---

[1] This background is taken from a review of the documents filed by the Respondent. *See doc. 12.*

a block from Hop's triplex.

As Hop approached his front door, he noticed it was slightly ajar. When he began to push it open, someone from the inside gently but forcefully closed it and locked it. Hop got out his keys, entered the apartment, and saw a man standing 30 feet away at his back door. The man turned and went out the back door. Hop went to the back door and retrieved a handgun from a cupboard next to the door. He stepped outside. He saw the man pausing at the fence around the back yard of the triplex containing Hop's apartment. The man turned slightly to his left, and Hop saw he had something in his left hand. Although Hop told officers at the scene that he fired a shot into the ground, Hop testified at trial that he fired over the man and toward some shops. The man went through the gate and around the corner of the triplex. Hop re-entered his apartment and went out the front but did not see anyone. He called 911, describing the man as a "big guy, about 6 feet, 180, 200 pounds, light colored ball cap, light sweatshirt." Hop himself was 6'1" tall. Sartain was either 5'6" or 5'8" tall. He told a detective the man was wearing jeans and clean-shaven, but Sartain had a goatee. At trial, Hop said the man was "not tall, not fat, husky," and wearing a "light colored shirt." At trial, Hop identified the man as Sartain.

Kristi Helsper lived two doors down. She testified she heard a noise so loud and sudden it frightened her parrot, which "hit the floor." She went to the front

window, facing the street, and saw a man running south down the sidewalk, away from her, on Bozeman Avenue. She did not see his face.

A short time after that, Adrian Inabnit, who lived on Bozeman Avenue and was having lunch with his wife in front of the large window looking into their back yard, suddenly saw a stranger walking quickly through his yard toward the alley.

A short time after that, Jason Schutz heard his German Shepherd, "Chewie," barking more loudly than he had ever heard before. Schutz lived on North Black, which runs parallel to Bozeman Avenue. An alley halfway between Bozeman and Black separates neighbors' back yards. When Schutz went outside to check on Chewie, he saw a stranger "going over" his fence on the south border of his property. Two gates led into the back yard, and Schutz said it was not uncommon for people to come into the back yard, but the stranger did not use a gate. Schutz asked the man what he was doing. The man said something to the effect of "your dog was chasing me," and Schutz "[was] just kind of like, well, you're in my yard." Schutz also testified that Chewie barked but was not aggressive.

The man asked Schutz if he was "Jeremy" and said he was supposed to meet someone by that name for a job interview. Schutz said he was not Jeremy, and the man turned and left, walking quickly to the south. Schutz thought the man's behavior was odd, so he went from the back of his house to the front and was still watching the

man walking quickly away when a Bozeman police car pulled up. Officer Klumb, one of several officers who responded to Hop's 911 call, asked Schutz what he was looking at. Schutz pointed at the man and said, "That man. He was just in my back yard." At trial, Schutz identified the man as Sartain.

Klumb immediately pursued the man, who was wearing clothes consistent with the description given to the 911 dispatcher. The man proved to be Sartain. Klumb approached him with his firearm drawn and instructed him to put down the object in his hand. It was a cell phone. Sartain said something like, "The police are here," closed it, put it in a leather carrier on his hip, turned around, knelt, and put his hands up. He was sweaty and out of breath. Klumb holstered his weapon, handcuffed Sartain, patted him down, removed his cell phone, checked his pockets, and removed their contents. As Klumb searched him, he could feel Sartain's heart pounding, as if he had been physically exerting himself. When Klumb completed the search, Sartain said, "May I ask what this is all about?" Klumb told Sartain he was under arrest on suspicion of burglary. Sartain said, "Oh." He was arrested fourteen minutes after the 911 call was received.

Klumb put Sartain in the patrol car; Schutz testified that he watched Sartain from the moment of re-locating him on the sidewalk at the front of his house until Klumb completed the arrest. Klumb then returned to Schutz's house, where Schutz

pointed out where the stranger had been in his back yard. A little while later, Klumb took Sartain in turn to Helsper and Hop, who both said he could have been the man they saw. Sartain was wearing sunglasses at the show-up but no hat. As Klumb started to take Sartain to the police station, Sartain asked whether he could give his car keys to an officer remaining at the scene so his wife could pick up his vehicle. The car was parked 60 feet from Hop's apartment.

A police dog, "Taco," tracked a scent trail from Hop's apartment in a direction consistent with witness testimony at trial. Taco started on the sidewalk, then cut across a few back yards, including Inabnit's, to an alley, then went into another yard and up to Schutz's fence, where Chewie was. Ziegler explained that Taco understood two different tracking commands. One command was to follow a "hot" scent, which Zeigler described as the smell of a person in fear or distress, and the other command was to find articles with that scent on them. Because Taco did not like other dogs, Ziegler terminated the "hot" search at Chewie's fence and switched to article location. Taco backtracked and alerted on a pry bar. Defense counsel pointed out that police could have had Taco track a "hot" scent all the way from Hop's apartment to the location where Sartain was arrested, or backward from the place of the arrest to Hop's apartment, but they did not do so.

Detective Knight testified that the pry bar would have made marks similar to

those found on Hop's front and back doors. Footprints found next to the pry bar in the alley were similar to those found in Hop's back yard, Inabnit's back yard, and just outside and inside Schutz's back yard where Schutz saw Sartain. All of those prints were the size and tread of Sartain's boots.

In an interview with Knight at the station, Sartain said he parked on Aspen because he and his wife wanted to buy a house in the neighborhood. Knight testified that his investigation had shown that Sartain and his wife were not, in fact, looking for a house in the neighborhood. Sartain said he heard about the house for sale from a customer where he worked. He did not describe or name the customer, who was never identified. Sartain said that when he was near Schutz's house, he could see his car, but Knight testified that was impossible. Sartain initially did not mention he had talked to Schutz; he said only that he went south from Schutz's house to get away from the dog. But he was still walking quickly or jogging when Klumb caught up with him, and that was about a block and a half away from the dog, who remained in the fenced yard the entire time. Later, Sartain said he went south from Schutz's house because he had heard there was another house for sale in the neighborhood. Sartain then said he told Schutz he was looking for Jeremy, but Sartain did not say anything to Knight about a job interview, as he had told Schutz.

A month after the incident, Hop filled out a restitution form and stated that

7

nothing was missing from his apartment. About three months after that, Hop contacted the police and reported that he had just discovered a man's bracelet was missing from his apartment.

The jury convicted Sartain. Because he was on probation for a 2001 burglary conviction when he committed the new offense, he was designated a persistent felony offender. On April 13, 2009, Sartain was sentenced to serve 40 years in prison. Pet. (doc. 1) at 2-3 ¶¶ 2, 4; Mont. Code Ann. §§ 45-6-204(3), 46-18-501, -502(1).

Sartain appealed, but the Montana Supreme Court affirmed his conviction. *State v. Sartain*, 241 P.3d 1032, 1034 ¶ 1 (Mont. 2010). Sartain's conviction became final on February 22, 2011, when the United States Supreme Court denied his petition for writ of certiorari. *Gonzalez v. Thaler*, __ U.S. __, 132 S. Ct. 641, 653-54 (2012).

On September 7, 2011, Sartain filed a petition for postconviction relief in the trial court. Counsel responded by affidavit to his claims of ineffective assistance of counsel. The trial court denied relief. On July 31, 2012, the Montana Supreme Court affirmed. *Sartain v. State*, 285 P.3d 407, 410 ¶ 1 (Mont. 2012).

Sartain timely filed his federal habeas petition on November 8, 2012. 28 U.S.C. § 2244(d)(1)(A).

### III. Sartain's Claims

Sartain contends, first, that he was denied a speedy trial. Pet. (doc. 1) at 4 ¶

13A; Mot. for Summary Judgment (doc. 5) at 2-3. He also contends that counsel was ineffective in several respects: (1) he failed to challenge a show-up identification, (2) he failed to adequately investigate the case, (3) he failed to object to the admission of illegally obtained evidence, and (4) he refused to allow Sartain to testify. Pet. (doc. 1) at 5, 9-11. Sartain also alleges that the prosecutor withheld evidence "until the middle of trial." *Id.* at 12. He also contends that appellate counsel failed to raise "all issues" regarding his right to a speedy trial and failed to challenge the prosecutor's misconduct. *Id.* at 13.

## IV. Analysis

Some or all of Sartain's claims may be barred on procedural grounds, such as procedural default, but it is clear that he is not entitled to relief on the merits of his claims. Accordingly, it is more efficient to proceed to the merits. *See, e.g.*, 28 U.S.C. § 2254(b)(2); *Lambrix v. Singletary*, 520 U.S. 518, 524-25 (1997) (making detailed analysis of constitutional issue despite outstanding question as to procedural bar); *Gutierrez v. Griggs*, 695 F.2d 1195, 1198 (9th Cir. 1983).

### A. Speedy Trial

"[T]he right to a speedy trial is a more vague concept than other procedural rights. It is . . . impossible to determine with precision when the right has been denied." *Barker v. Wingo*, 407 U.S. 514, 521 (1972). Consequently, no rule sets

forth a specific period of time within which a trial must commence. Regardless of the vagueness of the concept, however, States have "a constitutional duty to make a diligent, good-faith effort" to bring the accused to trial. *Smith v. Hooey*, 393 U.S. 374, 383 (1969). Courts consider the conduct of both the prosecution and the defense and employ a balancing test, weighing the length of the delay between charge or arrest and trial, the reason for the delay, whether the defendant asserted his right to a speedy trial, and whether he was prejudiced as a result of the delay. *Barker*, 407 U.S. at 530. No one factor has "talismanic" significance. *Id.* at 533.

Sartain's trial commenced 357 days after his arrest at the scene of the crime. Pet. at 17 ("nearly one year in custody"); *Sartain*, 241 P.3d at 1036 ¶ 7. A federal speedy trial analysis is triggered as the delay "approaches one year." *Doggett v. United States*, 505 U.S. 647, 652 n.1 (1992). The delay was long enough to warrant a closer look, but only barely so.

Trial commenced on March 17, 2009. 1 Trial Tr. (doc. 12-4) at 1.[2] In August 2008, the court had offered a trial date in September 2008, but defense counsel had National Guard duty. Speedy Trial Hr'g Tr. (doc. 12-3) at 45:1-5. Having no

---

[2]   The State filed both days of the trial transcript in one exhibit (doc. 12-4). The court reporter, however, began each trial day with page 1. Thus, although the entire trial transcript is filed as doc. 12-4, the volume number is given to reflect whether the cited transcript page refers to Day 1 or Day 2 of the trial. Day 1 of the transcript ends at ECF page 65.

available dates in October, the court offered a trial date of November 3 and 5, 2008.[3] The State agreed, but defense counsel represented that three days would be required for trial. *See* Omnibus Hr'g Tr. at 21:25-26:8 (*appended to* Appellant Br. (doc. 12-5) at 21-22). The court set trial for its first three free days, beginning on March 17, 2009. Speedy Trial Hr'g Tr. (doc. 12-3) at 45:6-47:14.

Sartain asserts that he did not know of or agree to these delays, but the defendant is responsible for his counsel's requests for continuances. *Vermont v. Brillon*, 556 U.S. 81, __, 129 S. Ct. 1283, 1291-92 (2009). Sartain has never contended that the delay was created or exploited by the State to bolster its own case or to hamper the defense, *see Barker*, 407 U.S. at 531, and indeed the State resisted the continuance to March 17, Speedy Trial Hr'g Tr. (doc. 12-3) at 45:5-46:8, 47:5-18. The four-month period from the unworkable November 2008 date to March 17 is significant institutional delay that must be ascribed to the State, but institutional delay weighs less heavily than delay sought by the State, *Barker*, 407 U.S. at 532, and the November date was rejected by Sartain, not the State. Nor has Sartain shown that he lost defense witnesses or evidence as a result of the delay. *See Barker*, 407 U.S. at 531 & n.31, 532. To the extent the State relied on witnesses' identifications of Sartain, delay would tend to favor him, as the State had the burden of proof, and

---

[3] November 4, 2008, was Election Day.

memory tends to erode over time. To the extent the State relied on the results of the foot chase and dog track, the evidence was preserved. While Sartain was arguably subjected to somewhat harsher conditions of confinement at Montana State Prison than he would have been in a local jail, prejudice from pretrial detention is less serious than trial prejudice, *Barker*, 407 U.S. at 532, and it is the only factor distinctly favorable to Sartain.

The balance of all the factors plainly weighed against Sartain. His speedy trial claim should be denied.

## B. Ineffective Assistance of Trial Counsel

Claims of ineffective assistance of counsel are governed by *Strickland v. Washington*, 466 U.S. 668 (1984). Sartain must allege facts sufficient to support an inference both that counsel's performance fell below an objective standard of reasonableness, *id.* at 687-88, and that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694. "[T]here is no reason . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.* at 697.

### 1. Show-Up Identification

"[A]dmission of evidence of a showup[,] without more[,] does not violate due process." *Neil v. Biggers*, 409 U.S. 188, 198 (1972). "[T]he primary evil to be

avoided is 'a very substantial likelihood of irreparable misidentification.'" *Id.* (quoting *Simmons v. United States*, 390 U.S. 377, 384 (1968)). "Short of that point, such evidence is for the jury to weigh." *Manson v. Brathwaite*, 432 U.S. 98, 116 (1977). Courts must consider "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." *Biggers*, 409 U.S. at 199-200.

Here, even assuming the show-up was unduly suggestive,[4] there was not a substantial likelihood of irreparable misidentification. First, Hop and Helsper did not positively identify Sartain. Helsper did not see his face at all. Hop said only that Sartain could have been the person he saw but he was not certain because Sartain was now wearing sunglasses and was not wearing a hat. 1 Trial Tr. at 112:2-9. In addition, defense counsel drew the jurors' attention to the importance of the circumstances, including the arrangement of the courtroom at trial and Hop's references to seeing Sartain on television the night of the incident. 1 Trial Tr. at

---

[4] Sartain was handcuffed and emerging from a police car. These circumstances, by themselves, are suggestive. The record does not show whether Sartain was dirty, disheveled, sweaty, or otherwise appeared to have been on the run or to have scuffled with police. Such circumstances might also be suggestive. Further, it is not clear whether Helsper and Hop saw each other's, or one saw the other's, identification. If either did, that too would be suggestive.

114:14-122:21. Counsel also discussed eyewitness testimony and unreliable identifications in detail in voir dire, with significant wary responses from prospective jurors. *E.g.*, 1 Trial Tr. at 45:4-49:14. And, at the conclusion of trial, the trial court instructed the jury to consider the suggestive circumstances of the show-up. 2 Trial Tr. at 163:25-164:25. These measures undermined the reliability of the identifications to such an extent that there is no reasonable probability Sartain would have been acquitted if their identifications had been excluded. *Compare, e.g.*, *Foster v. California*, 394 U.S. 440, 443 (1969) (describing witness's progressively more certain identification after repeated suggestive viewings of defendant). This claim should be denied.

## 2. Pretrial Investigation

Sartain claims counsel failed to investigate fingerprint evidence. Pet. at 9-10 ¶ 13C, 25-26. He states that he told counsel the fingerprints taken from the scene would not match his, but counsel failed to consult with an expert witness who could have testified the prints were not Sartain's.

Partial prints were taken from the scene. *See* Objection Ex. A (doc. 8 at 5). At trial, defense counsel pointed out that Hop directed police where to look for fingerprints and obtained Hop's statement that "I'm sure he [the intruder] wasn't wearing gloves." 1 Trial Tr. at 143:18-144:10. And the State introduced no

fingerprint evidence.

Fingerprint evidence is frequently inconclusive. Had Sartain's prints been identified, that would have been very compelling evidence against him, because he claimed he was not in the apartment. But the reverse is not true: if the prints were not identifiable, or if the partial prints were inconsistent with Sartain's, that would not show Sartain was not in the apartment. It would show only that he did not leave those prints.

A positive identification of the partial prints as those of someone else whose appearance at the time of the crime was similar to the description given by the witnesses and who could have been in the neighborhood at the time of the incident would be helpful to Sartain. But there is no evidence to suggest that such a person exists. The possibility is merely speculative.

Counsel's decision to forego testing of the partial prints was a reasonable one. Nor is there a reasonable probability that Sartain might have been acquitted if only counsel had obtained an independent analysis of the partial prints. This claim should be denied.

### 3. Failure to Object to Illegally Introduced Evidence

Sartain claims counsel was ineffective because he did not object to Hop's testimony about the bracelet. *See* 1 Trial Tr. at 138:1-143:6; Pet. at 10 ¶ 13D, 27-29.

If Hop's report to the prosecution met the definition of a "statement," Mont. Code Ann. § 46-1-202(26), then state law mandated its disclosure, Mont. Code Ann. §§ 46-15-322(1)(a), (e), -327. But, regardless, counsel capitalized on the State's omission: Hop's discovery was late, he was careless with the bracelet so there was no reason to think it was taken at the time of the incident, Sartain did not have the bracelet even though he was arrested quickly after the 911 call, and no bracelet was found on the route that Sartain took through the neighborhood. The jury was correctly instructed that the State had to prove the defendant *intended* to commit theft in Hop's apartment, 2 Trial Tr. at 166:3-23; Mont. Code Ann. § 45-6-204(1) (2007), not that something was in fact stolen. Counsel's decision not to object but instead to cross-examine Hop on the issue was reasonable and likely more beneficial to Sartain than an objection would have been. This claim should be denied.

### 4. Defendant's Testimony

Sartain alleges that counsel prevented him from testifying on his own behalf. Pet. at 11 ¶ 13E, 29-30. After the State rested and the jury was excused for lunch recess, the trial court asked counsel what his plans were for the afternoon. The following exchange took place:

The Court:   Mr. Moore, what is your plan here now?

Moore:        Do you wish to testify or not?

16

Sartain:     Yeah.

Moore:      You want to?

Sartain:     You bet.

Moore:      Okay. You don't have to. You have the right to testify or the right to choose not to testify. You can have a conversation, I mean we can take a minute or two and you can have a conversation with me about whether you actually want to.

Sartain:     Yeah, I think that would be fair.

2 Trial Tr. at 135:24-136:12. When trial resumed, the defense rested. *Id.* at 139:15-21.

A defendant's failure to inform the Court, before the verdict is returned, that he wishes to testify waives any future claim that his counsel failed to tell him he could testify. *See United States v. Nohara*, 3 F.3d 1239, 1243-44 (9th Cir. 1993); *United States v. Edwards*, 897 F.2d 445, 446-47 (9th Cir. 1990). At any rate, counsel plainly told Sartain he had a right to testify. This claim should be denied.

### C. Prosecutorial Misconduct

Sartain claims the prosecution committed misconduct because it presented "false" and "staged" testimony at trial. Pet. at 12 ¶ 13F, 30-32. Hop's testimony about the bracelet may have been false, or it may have been true. But there is no evidence to suggest that the State knew it to be false, and thus the State had no

obligation to "correct" it. *See Napue v. Illinois*, 360 U.S. 264, 269 (1959). This claim should be denied.

### D. Ineffective Assistance of Appellate Counsel

#### 1. Speedy Trial

Sartain contends appellate counsel should have alerted the Montana Supreme Court that Sartain wrote letters to his counsel about his right to a speedy trial. Pet. at 13 ¶ 13G, 32-34.

Sartain's letters to counsel were not filed; they were mailed to defense counsel. Matters not in the trial court's record cannot be presented on direct review. *E.g.*, Mont. Code Ann. § 46-20-701(1); Mont. R. App. P. 8(1). Sartain states that appellate counsel told him he "should raise the letters in my postconviction appeal." That advice was correct. *Cf. Sartain*, 285 P.3d at 412 ¶ 15.

Although this claim is directed at appellate counsel, Sartain raised in state court (as appellate counsel directed) a claim that trial counsel was ineffective for failing to introduce Sartain's letters in support of the motion to dismiss. But, as the Montana Supreme Court noted, "our review of the record does not convince us the documents would likely have altered the result, had they been considered," because Sartain's letters, *see* Mem. in Supp. of Postconviction Pet. Exs. A, B (doc. 12-10 at 27-29), were written in May 2008, whereas the speedy trial issue arose in connection with the

omnibus hearing in August 2008. Finally, at the pretrial hearing, counsel explained on the record that he acquiesced in the continuance from August to March 17, 2009, because Sartain wanted him to trace, interview, and call at trial all the participants in the case. *E.g.*, Speedy Trial Hr'g Tr. (doc. 12-3) at 61:4-24. There was nothing unreasonable about counsel's acquiescence in the continuance.

Neither trial counsel nor appellate counsel performed unreasonably in connection with the speedy trial issue. This claim should be denied.

## 2. Prosecutorial Misconduct

The prosecutor's failure to disclose Hop's late report about the bracelet was not misconduct unless the report was a "statement." Mont. Code Ann. § 46-1-202(26). There is no evidence it was. At any rate, even assuming it was, there is no reason to think the omission affected Sartain's substantial rights, *see* Mont. Code Ann. § 46-20-701(1), because counsel used Hop's tardiness in Sartain's favor. There is no reason to think the State knew Hop's testimony to be false. Appellate counsel's failure to raise this issue was neither incompetent nor prejudicial to Sartain. This claim should be denied.

## V. Motions for Discovery, Evidentiary Hearing, and Counsel

With his petition, Sartain filed motions for discovery and for counsel. Mots. (docs. 3, 4). Those motions were denied because prescreening encompasses them.

19

Order (doc. 7) at 1-2 & ¶ 2. In response to the State's filing of the pertinent portions of the state court record, Sartain renewed his motion for counsel and also moved for an evidentiary hearing.

Sartain seeks work product of the Gallatin County Attorney's Office so that he may show the prosecutor and/or police "coached" the witnesses to identify him and knew witnesses had identified someone else as the culprit. Mot. for Discovery (doc. 4) at 2.[5] There is no evidence to suggest either of these things is true. Sartain seeks the prosecutor's file so that, if what he imagines did occur, he would have proof of it.

In federal habeas proceedings, a petitioner must state "reasons" for his discovery requests, and a court may permit discovery only on a showing of "good cause." Rules 6(a), (b), Rules Governing § 2254 Cases. Sartain has not shown either. Evidence someone else committed the crime would no doubt be relevant and helpful to him, but that is true in every federal habeas case. If that fact alone justified discovery, there would be no need to condition discovery on "reasons" and "good cause." "Habeas corpus is not a general form of relief for those who seek to explore their case in search of its existence." *Aubut v. Maine*, 431 F.2d 688, 689 (1st Cir.

---

[5] Sartain also seeks evidence to support his claim concerning Hop's testimony about the bracelet and testing of the partial fingerprints obtained at the scene. Mot. for Discovery (doc. 4) at 2. Those issues have been previously addressed.

1970), *quoted in Nicolaus*, 98 F.3d at 1106. On the contrary, a habeas petition must make "a prima facie case for relief." *Nicolaus*, 98 F.3d at 1106 (quoting *Harris v. Nelson*, 394 U.S. 286, 290 (1969)). As Sartain's petition fails to do so, and as he fails to show reasons or good cause for the discovery he seeks, there is no need to further consider his requests.

## VI. Certificate of Appealability

"The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11(a), Rules Governing § 2254 Proceedings. A COA should issue as to those claims on which the petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The standard is satisfied if "jurists of reason could disagree with the district court's resolution of [the] constitutional claims" or "conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).

Sartain's claims do not meet the required standard. His trial occurred within a year of the crime, and he sought the continuance from August 2008 to March 2009. While institutional delay played a role in that continuance and Sartain may have suffered some prejudice from his pretrial detention at Montana State Prison, these

factors are simply not weighty enough to constitute a violation of his right to a speedy trial.

Sartain's claims of ineffective assistance of counsel also lack substance. The show-up identification may have been suggestive, but the possibility of an "irreparable" misidentification was not "very substantial." The witnesses did not positively identify Sartain at the show-up, and there were no follow-up pretrial lineups. Sartain's conviction rested principally on other evidence – his peculiar presence in people's back yards, his apparent flight from a police officer, footprints, a partial canine track, and pry bar marks that were all consistent with Sartain's guilt, Sartain's own behavior when apprehended, and his inconsistent statements to explain what he was doing in the back yards of people he did not know. Even assuming the State should have disclosed before trial witness Hop's report of the missing bracelet, the report was questionable and was not material to the verdict. Sartain waived his right to testify. In each of these instances, Sartain failed make a showing on one or both prongs of the *Strickland* test.

Sartain's remaining claims also lack merit. Sartain has not shown the prosecution should have disclosed Hop's late report, and even if it should have, again, it was not material, and there is no reason to think the State knew the report to be false (or that it was false). Appellate counsel's argument on the speedy trial claim

would not have been improved by Sartain's letters, which predated the continuance that led to the speedy trial claim, and the prosecutorial misconduct claim was weak at best.

Sartain presents no open questions and nothing on which reasonable jurists could disagree. A certificate of appealability is not warranted.

Based on the foregoing, the Court enters the following:

## ORDER

Sartain's motion for an evidentiary hearing and for the appointment of counsel (doc. 13) is DENIED.

The Court also enters the following:

## RECOMMENDATION

1. The Petition (doc. 1) should be DENIED on the merits.

2. The Clerk of Court should be directed to enter by separate document a judgment in favor of Respondents and against Sartain.

3. A certificate of appealability should be DENIED.

## NOTICE OF RIGHT TO OBJECT TO FINDINGS & RECOMMENDATION AND CONSEQUENCES OF FAILURE TO OBJECT

Pursuant to 28 U.S.C. § 636(b)(1), Sartain may serve and file written objections

to this Findings and Recommendation within fourteen (14) days of the date entered as indicated on the Notice of Electronic Filing. If Sartain files objections, he must itemize each factual finding to which objection is made and must identify the evidence in the record he relies on to contradict that finding; and he must itemize each recommendation to which objection is made and must set forth the authority he relies on to contradict that recommendation. Failure to assert a relevant fact or argument in objection to this Findings and Recommendation may preclude Sartain from relying on that fact or argument at a later stage of the proceeding. A district judge will make a de novo determination of those portions of the Findings and Recommendation to which objection is made. Failure to timely file written objections may bar a de novo determination by the district judge and/or waive the right to appeal.

Sartain must immediately notify the Court of any change in his mailing address by filing a "Notice of Change of Address." Failure to do so may result in dismissal of his case without notice to him.

DATED this 7th day of August, 2013.

/s/  Carolyn S. Ostby
United States Magistrate Judge